The Texas and Pacific Railway Company v. Commissioner.
Texas & Pac. Ry. Co. v. Commissioner
Docket No. 105730.
United States Tax Court
1943 Tax Ct. Memo LEXIS 389; 1 T.C.M. (CCH) 863; T.C.M. (RIA) 43165; March 25, 1943
*389 M. E. Clinton, Esq., Texas & Pacific Bldg., Dallas, Tex., and Francis J. Sweeney, Esq., for the petitioner. James L. Backstrom, Esq., for the respondent. HARRON Memorandum Opinion HARRON, Judge: The respondent determined a deficiency in income tax for the year 1937 in the amount of $10,794.61. At the hearing, by his answer to petitioner's amended petition, respondent claimed that the deficiency should be increased to $22,278.98. Petitioner contends that there is no deficiency and that tax has been overpaid in the amount of $118,466.87. Petitioner filed its income tax return with the collector for the second district of Texas. The parties have stipulated certain facts, and the stipulation is incorporated by reference. The facts are set forth to the extent necessary to understand the questions. [The Facts] I. Petitioner operated a railroad in 1937 between New Orleans and El Paso, via Shreveport, Fort Worth, and Sweetwater for the carrying of passengers and freight. Sections of petitioner's track in low and wet spots subsided and got out of alignment due to water pockets and mud heaves so as to require almost the entire time and attention of the maintenance crews of said sections, *390 to the neglect of the balance of the section. The petitioner having unsuccessfully attempted to repair such conditions by the use of ditches, rock, tile and pipe drains, decided that something substantial had to be done and chose the driving of posts near the ends of the crossties at those points to take care of such conditions. During the calendar year 1937, petitioner drove 186,900 unpeeled posts into the sub-grade of its road bed beyond the end of the ties. In the places where the posts were driven, the gravel and embankment was removed for several inches and the posts were driven so that the tops of the posts were about 4 or 5 inches below the crossties, and the dirt and gravel removed were replaced, leaving the top ends of the posts completely covered to a depth of several inches. Ninety percent of said posts were pine, although some were oak, gum, and elm. These untreated posts in penetrating the road bed literally arrested and thwarted such conditions. The posts were driven parallel with the track beyond the end of the ties on 18-inch cinders. The untreated posts were from 7 to 9-inches in butt diameter and generally were 8-feet in length, although some were from 8 to 12-feet *391 in length. The costs incurred for driving the posts during 1937 was $87,213.80 and involved 22.65 miles of single track main line and 3.7 miles of double track main line track adjacent to sidings. The posts driven during the year 1937 are at present in the embankment and they have been effective in curtailing consequential increases in maintenance and operating expenses. The posts made a retaining wall, produced good results, added great stability to the track, arrested lateral displacements, reduced hazards, and permitted safer operations at increased speeds. Thereafter, the track at the points where the posts were driven required less maintenance expenses. For these reasons petitioner carried on post driving in subsequent years at a cost of $72,534.62 in 1938; $70,144.72 in 1939; $34,781.15 in 1940; and $49,664.03 during the first eight months of 1941. The object was to get the railroad in condition for safe and proper operation for reasonably high speed passenger and freight trains and to keep it that way. In attempting to cure the recurring bad conditions evidenced by water pockets and mud heaves, the petitioner prior to 1937 installed clay tile drainage; numerous stone drains; *392 cut ditches across the roadbed and filled with large stones; installed perforated iron pipe drains; and widened the embankments, which had some value, but were not permanent or satisfactory or successful, and were too expensive. The digging out the affected spots and replacing with entirely new material proved an effective remedy for these conditions, but that was found to be too slow and too expensive. The water pockets and mud heaves have occurred ever since the roadbed was ballasted. At one point posts were driven continuously for nearly three miles. The posts driven in 1937 were in 1941 performing the purpose for which they were driven and at only one spot were they leaning over, which was not due to the decay of the posts, but to severe side thrust pressure. In September and October, 1941, R. J. Russell, a geologist, and R. H. Gaines, an employee in petitioner's maintenance of way department examined approximately 100 posts, in groups of 3 or 4 posts at 25 or 30 individual pits, of which about one-half were driven in 1937, and the balance in subsequent years. Photographs were taken of a number of these posts, which disclose that all of these posts except three in one spot were *393 in a well-preserved condition and had not rotted to any appreciable extent. The photographs in evidence disclose that the posts in Figure 25 were practically immersed in water. Posts completely submerged in water will last indefinitely. These places examined by Gaines and Russell are fairly representative as to the conditions of the posts driven in 1937. The greater part of the posts driven in 1937 will be in use for a great many years, and some of them perhaps indefinitely. The posts driven in 1937 were in use in October, 1941, and, with the exception of one place, were performing fully and satisfactorily the service for which they were driven, to hold the gravel and dirt under the ties and thus to stabilize and keep more permanent the roadbed and enable the petitioner to take care of more and more heavier traffic. It has been stipulated that this expenditure reduced maintenance expenses in subsequent years. The petitioner's accounting department first charged the costs of driving of posts in 1937 to Account No. 3, a capital account. Later, upon instructions from its officers they were changed to Account 202, an account for roadway maintenance. After an investigation by an examiner, *394 the Interstate Commerce Commission wrote petitioner a letter directing that this be restored to Account No. 3 and not charged to cost of maintenance. The petitioner filed a protest with the Interstate Commerce Commission, which has not been finally acted upon. In its return petitioner deducted $87,213.80 as an ordinary expense incurred in the maintenance and operation of its railroad during 1937. Respondent disallowed the deduction for the reason that the expenditure represented the cost of additions and betterments and should be capitalized. [Opinion] The question is whether the cost of driving posts into petitioner's roadbed is chargeable to a capital account or to operating expenses. If it is not chargeable to operating expenses, it is not deductible. Great Northern Ry. Co. v. Commissioner, 40 Fed. (2d) 372. Petitioner is a Class I steam railroad, and employs the method of accounting prescribed by the Interstate Commerce Commission for such railroads. Petitioner uses the retirement method as to its roadbed. The purpose of driving posts into the roadbed was to improve and better the roadbed structure. This method is not uncommon. It is followed *395 by other railroads according to testimony given in this proceeding. The evidence shows that such method of improving the roadbed is of a semi-permanent nature. The life-period of such improvement extends over several years. It is not of a temporary nature. It strengthens embankments and grading and extends their useful life. It decreases the maintenance expenses of subsequent years. It represents additions and betterments which increased petitioner's capital investment. The expenditure was not for repairs as petitioner contends. At the time of the hearing in this proceeding, a ruling of the Interstate Commerce Commission was in effect which directed that the expenditure in question should be charged to Account No. 3, a capital account. Under that ruling petitioner capitalized the expenditure. Petitioner has failed to present evidence or legal argument upon which it can be concluded that the expense was not a capital charge. It is held that the expense is a capital expense and is not deductible in the taxable year. Respondent's disallowance of the deduction is sustained. See Atlantic Coast Line Railroad Co., 31 B.T.A. 730, 753, 754, affd. on other points, *396 81 Fed. (2d) 309, where it was held that certain expenses which were capitalized under instructions from the Interstate Commerce Commission could not be deducted. [The Facts] II. Petitioner owned all of the stock of the Texas and Pacific Coaches, Inc., a Texas corporation, from April 5, 1929, through 1937. Petitioner used the coach line to transport passengers between Millsap, Texas, and Mineral Wells, Texas. The distance between the above towns is 8 miles and the bus service was operated in order to relieve petitioner of operating a railroad line which would serve the same points. Petitioner transferred passengers from its main railroad line at Millsap to the bus line. During the years 1929 to 1933, inclusive, petitioner and Coaches, Inc. filed consolidated returns. They were not permitted to file consolidated returns during the years 1934, 1935, and 1936. From June 6, 1929, to December 31, 1936, Coaches, Inc., sustained operating losses aggregating $71,947.93, including depreciation aggregating $23,328.13. The operating losses, exclusive of depreciation, amounted to $48,619.80. During the above period petitioner advanced to Coaches, Inc., $48,619.80 *397 to take care of its operating losses, exclusive of depreciation, plus $11,613.32 which was expended for the acquisition of capital assets, total $60,233.12. In the consolidated returns for the years 1929, 1930, and 1931, petitioner reported taxable income, and Coaches, Inc., sustained operating losses including depreciation as follows: 1929, $5,829.47; 1930, $8,933.11; and 1931, $10,527.49; or a total of $25,290.07, including depreciation of $9,499.91, which depreciation was deducted on the returns of Coaches, Inc., and reflected in the consolidated taxable income for said years as follows: 1929, $6,391,056.35; 1930, $3,864,711.60; 1931, $1,037,837.47. During the years 1932 and 1933 the petitioner and Coaches, Inc., sustained operating losses and no income taxes were paid by either in said years. The operating losses of Coaches, Inc., including depreciation were as follows: 1932, $10,211.87, including depreciation of $3,308.07, and for 1933 a loss of $12,581.54, including a depreciation of $3,683.40. During the years 1934, 1935, and 1936, the petitioner and Coaches, Inc., were not permitted to file consolidated returns and in said years Coaches, Inc. sustained operating losses including *398 depreciation as follows: 1934, $9,384.49, including depreciation of $3,683.40; 1935 a loss of $8,970.93, including depreciation of $3,153.35, and 1936 a loss of $5,509.03 with no deduction for depreciation. In December 1937 petitioner charged said sum of $60,233.12 to surplus (the credit was to Account No. 706 - Investments in Affiliated Companies (d) Advances); and Coaches, Inc. credited this amount to its surplus account. The advances by petitioner to Coaches, Inc. for the years 1929 to 1937, inclusive, amounting to $71,463.31 were charged on the books of petitioner to Account 706(d) and so shown as advances to Coaches, Inc. By journal voucher entries dated December 31, 1937, two credits were made to this account. The first entry was in the amount of $60,233.12, which credit was offset by charge to current profits and loss account, which profit and loss account was transferred into the surplus account in the annual closing of all operating accounts. The second credit in the amount of $9,303.56 was likewise charged to current profit and loss account and in turn closed into surplus. By applying these two credits the debit balance in Account 706(d) was reduced to $1,926.63. This *399 sum of $1,926.63 was the net book value of the current assets on the books of Coaches, Inc. on December 31, 1937. All of the stock of the Texas and Pacific Coaches, Inc. has been owned by the petitioner up to the present time, and Coaches, Inc. has continued to operate since 1937 as in 1937 and previous years. The explanation given in the entry crediting the amount to "Advances" states, in part: Contribution to the capital of Texas and Pacific Coaches, Inc., made through cancellation of advances by The Texas and Pacific Railway Company to cover operating deficits of T. & P. Coaches, Inc., during the period from June 6, 1929, to December 31, 1936. Authority, President's letter of December 11, 1937. The president's letter of authorization, dated December 11, 1937, stated as follows: Since it appears the Texas and Pacific Coaches cannot liquidate its indebtedness to the Texas and Pacific on basis of present operations, you are authorized to write off to Profit and Loss in accounts of both companies as a forgiveness of indebtedness and contribution to capital of the Coaches, advances of $60,138.05 * (sic) made to December 31, 1936, covering operating deficits of the latter Company. *400 For 1937 and monthly thereafter, contributions to the Texas and Pacific Coaches, Inc. for operating deficits should be charged to Account 545, Separately Operated Properties - Loss, and its net profits, if any, taken up as a credit to Account 512, Separately Operated Properties - Profit, such accounting to be adopted because service performed by the Coaches is essentially a part of Texas and Pacific passenger service. Please arrange. In the 1937 return of Coaches, Inc., the analysis of earned surplus showed that there was a deficit at the beginning of the year of $71,947.93, and at the end of the year, a deficit of $11,714.81. The reduction in the deficit was shown to be due, in part, to "contribution by shareholders" in the amount of $60,233.12. The amount of $71,947.93 represented total operating losses from June 6, 1929, to December 31, 1936. During 1937 petitioner advanced $9,303.66 to Coaches, Inc. to cover its operating expenses in excess of its operating revenues. Its operating costs exceeded its gross receipts by $7,611.29. The return for 1937 of Coaches, Inc. showed a net loss, and, also, reported as "other income" the above advance *401 made by petitioner with the explanation "operating loss transferred to T. & P. Ry. Co." Petitioner debited $9,303.56 to an account "separately operated properties - loss" and credited the same amount to an account "advances - T. & P. Coaches, Inc.", with the explanation "To charge income with net loss resulting from operations of T. & P. Coaches, Inc., for year 1937, in accordance with President's letter of December 11, 1937," i.e., petitioner regarded the above amount as a loss from separately operated properties under the Interstate Commerce Commission accounting regulations. In its income tax return for 1937, petitioner deducted $9,303.56 as an expense for the year 1937, which respondent allowed. However, in his answer in this proceeding, respondent alleged that was error and now contends that the item is not deductible. In its return for 1937, petitioner did not take a deduction in any amount for the item of $60,233.12, which was charged to miscellaneous debits in 1937. Petitioner now claims a deduction in 1937 for a bad debt in the amount of $44,442.96. In the petition, as amended, petitioner states that the sum of $44,442.96 represents a total of the following: advances to *402 Coaches, Inc., to take care of operating losses, exclusive of depreciation during 1932 to 1936, inclusive, $32,829.64, [1] plus the $11,613.32 advanced to purchase capital assets. This explanation is borne out by the stipulated facts. Petitioner states further, in the petition, that for the period from June 6, 1929, to December 31, 1933, Coaches, Inc. was included as an affiliate in the consolidated income of the petitioner with the result that of the "aforesaid indebtedness" $17,783.19 has been heretofore allowed as operating loss deductions. We have been unable to locate in the record any proof or agreed facts which bears out the later statement. [Opinion] (a) Claim for bad debt deduction of $44,442.96. The question is whether petitioner ascertained to be worthless and charged off a bad debt of Coaches, Inc. in 1937. Petitioner contends that the deduction is allowable, because its subsidiary was unable *403 to pay the debt. Although petitioner's president directed that the debt should be forgiven and that the accumulated advances of prior years should be treated as a contribution to the capital of Coaches, Inc., and bookkeeping entries were made accordingly in the books of both corporations, petitioner now takes the position that the action taken in 1937 should not be regarded as constituting a capital contribution. Respondent contends that the evidence does not support petitioner's claim, but shows that there was a contribution to capital. The evidence consists only of certain agreed facts showing the financial condition of Coaches, Inc., since its creation in 1929, the bookkeeping entries, and the letter of December 11, 1937. Under Regulations 94, article 22(a)-14 a gratuitous forgiveness of a debt by a shareholder amounts to a contribution to the capital of the corporation. The regulation has persuasive force in view of its repeated adoption by the Commissioner under many revenue acts. Johnson, Drake & Piper, Inc. v. Helvering, 69 Fed. (2d) 151. Helvering v. American Dental Co., 318 U.S. 322. However, in each instance *404 the circumstances under which advances by a shareholder are made to a corporation may be considered. If the advances are intended to enlarge the stock investment, they are a contribution to capital; if they are intended as a loan, they are not. Edward Katzinger Co., 44 B.T.A. 533, 536, affd. 129 Fed. (2d) 74. The circumstances under which petitioner made advances to Coaches, Inc., in each year from 1932 to 1936, inclusive, indicate that petitioner made them fully realizing that they were uncollectible. It is extremely doubtful whether the advances were intended to be loans in the years they were made, and the circumstances strongly indicate that the advances were intended to be contributions. From as early as 1903 petitioner had owned all of the stock of the Weatherford Mineral Wells and Northwestern Railway Company which owned and operated a line in Texas extending from Weatherford to Mineral Wells, a distance of 22 miles. Weatherford is on the mainline of petitioner. Prior to the creation of Coaches, Inc., all through passengers transported by petitioner and having an origin or destination at Mineral Wells were transferred *405 at Weatherford to the Weatherford railway. It developed that the small number of passengers did not justify passenger service on the Westherford railway between Weatherford and Mineral Wells, and that a more economical service could be provided by the operation of a bus transportation service operated between Millsap, on petitioner's mainline, and Mineral Wells, a distance of 8 miles. To provide such service, Coaches, Inc. was created. It has authorization only to transport through passengers of petitioner between the abovenamed points. From the limited evidence it appears that Coaches, Inc. only asset is its equipment consisting of busses; that the original cost of equipment was $26,613.32, of which petitioner advanced $11,613.32. The balance of the capital required to purchase the equipment, $15,000, was derived from the sale of the capital stock of Coaches, Inc. to petitioner. In each year, from the beginning, Coaches, Inc. has operated at a loss, and the deficit in operations in each year has been contributed by petitioner, that is, the sums advanced by petitioner to cover operating costs during the first 2 1/2 years, through 1931, aggregated $15,790.16, and averaged $6,316 a *406 year, and in each year thereafter, through 1936, the advances ranged from $8,898 to $5,509, and averaged $6,500 a year. It has been known from the start that the annual earnings of Coaches, Inc. would be insufficient to cover operating expenses and that petitioner would have to furnish about $6,000 in each year to maintain passenger service by bus to Mineral Wells. It has been known, also, that a proper reserve for the depreciation of the equipment of Coaches, Inc. is about $3,300 a year. There has never been any intention of liquidating Coaches, Inc., which is still in operation. The general and prevailing financial condition of Coaches, Inc., therefore, was such that petitioner must have realized that it could not recover its annual advances to Coaches, Inc. Advances to a wholly-owned corporation under such circumstances are contributions rather than loans, in the absence of some contractual arrangement under which the parent corporation agrees to pay the subsidiary for its services. During the years when consolidated returns could be filed for the two corporations, the annual loss of Coaches, Inc. served to reduce the income of petitioner under the consolidated return. After 1933 *407 consolidated returns could not be filed. The problem of petitioner's use of the services of Coaches, Inc. for tax purposes, arose at the latest in the year 1934. It was not until 1937, however, that petitioner determined to recognize the need of changing the inter-company accounting procedure with respect to the advances to be made in each year. In 1937 there was no occurrence which represented any change in the condition of Coaches, Inc., from the conditions in prior years. The decision made in 1937 was only to charge off the accumulation of all advances from 1929 through 1936 to start a new account with Coaches, Inc. Since, in reality, in the prior years petitioner could not have expected to be reimbursed for its advances to Coaches, Inc., there is every reason to hold petitioner to the declaration made in 1937 that all of the prior advances should be acknowledged to have been contributions to capital. Such contributions are not deductible as a bad debt. American Cigar Co. v. Commissioner, 66 Fed. (2d) 425, certiorari denied, 290 U.S. 699. Petitioner relies on Deeds v. Commissioner, 47 Fed. (2d) 695, *408 on the ground that Coaches, Inc. was "commercially insolvent" in 1937 when the total advances were charged off and were eliminated from petitioner's books as an account receivable. The Deeds case is not applicable here, because of the difference in the entire situation. In order to be entitled to a deduction for a bad debt, there must be an ascertainment of worthlessness in the year in which the deduction is claimed. In spite of the difference between ascertainment of worthlessness in the case of a deduction for a bad debt, and the sustaining of loss in the case of a deduction for a loss, the degree of liberality which the statute affords a taxpayer in the class of bad dept deductions does not go as far as to permit a total disregard for the time at which there is, in reality, a loss from a bad debt, and the year of ascertainment may not be put off in a casual way. If, for purposes of argument, other facts supported the view that petitioner is entitled to a bad debt deduction for its advances to Coaches, Inc., (and we do not find such factors present here), nevertheless, we are unable to find that there was no ascertainment of worthlessness of a debt in 1937. The alleged debt *409 was worthless in 1932, at the latest, and, thereafter, petitioner was advancing funds which clearly could not be repaid. At the end of 1931 Coaches, Inc. owed petitioner $15,790.16 for advances to cover operating expenses, plus $11,613.22 for advances to purchase equipment, total $27,403.48, and the depreciated value of the assets of Coaches, Inc. was $17,113.41. Coaches, Inc. was "commercially insolvent" as early as 1932 and thereafter, the insolvency grew worse progressively. As was stated in W. F. Young, Inc. v. Commissioner, 120 Fed. (2d) 159, 165: The words "debts ascertained to be worthless and charged off within the taxable year" seem inescapably to mean debts which were considered good when made, but subsequently ascertained to be worthless. So-called debts which were never expected to be repaid must be deducted as losses or not at all. Petitioner has not claimed a deduction on account of the accumulated advances as a loss in 1937 and that question is not in issue. It is held that the advances to Coaches, Inc. in each year were contributions to its capital and that the accumulated advances in the amount of $44,442.96 are not deductible as *410 a bad debt in 1937. (b) Claim for expense deduction of $9,303.66. Petitioner claims a deduction of $9,303.56 as a business expense in 1937. That amount was advanced to Coaches, Inc., for operating expenses in 1937. Petitioner's officers decided in 1937, after charging off the accumulated advances of earlier years, including 1936, not to treat advances to Coaches, Inc. for operating expenses as contributions to capital. Respondent originally allowed the deduction claimed, but he now contends that the amount claimed as a business expense in 1937 constituted a contribution to capital and is not deductible. In its separate return for 1937, Coaches, Inc. reported in its gross income the amount here in question, $9,303.56. It also reported gross receipts from operations in the amount of $3,196.23, total cost of operations, $10,807.52, and net loss from operations in the amount of $1,692.27. The facts show that, in reality, petitioner paid for services rendered to it by Coaches, Inc., when it advanced the sum in question. The only consumer of the services of Coaches, Inc. was petitioner and no one else may use its services. The services of Coaches, Inc. are necessary to petitioner *411 in the conduct of its business, and are essentially a part of petitioner's passenger service. Petitioner, since 1903, provided transportation to its through passengers to and from Mineral Wells, Texas, over a railroad line operated by a subsidiary until June of 1929, and thereafter, over the bus line operated by Coaches, Inc. Petitioner did not receive in return for its payment in 1937 anything other than services from Coaches, Inc. From every practical consideration, petitioner was not acquiring any capital asset by the payment involved under this issue, so that it is difficult to classify the expense as a capital expense. It had invested approximately $60,000 in Coaches, Inc., over a period of several years, and the only asset of that company was its equipment which had a depreciated value at the end of 1937 of $3,001. Also, the payment of $9,303.56 to Coaches, Inc. did not constitute an asset in its hands, but was used to pay its operating costs which exceeded its other income. No question would arise here if the payment had been made pursuant to a written contract with Coaches, Inc. to pay it for its services. The situation was the same as though a contract had existed. Under *412 the circumstances, petitioner is entitled to the deduction as a business expense in 1937. This conclusion is premised upon the view, which the facts support, that petitioner made a payment for services which was reported as income by Coaches, Inc. The same conclusion might not be correct in some other year where the facts were different and where the advance made under other conditions would constitute a capital investment. The situation here differs from that in Interstate Transit Lines, 44 B.T.A. 957, affd. 130 Fed. (2d) 136. The subsidiary in that case was organized to carry on an active business for profit and to do a business in which the parent corporation could not engage. Coaches, Inc. was organized to provide a service to petitioner and could engage in no other business. It was unable to function except for the business which petitioner transferred to it and for which petitioner had to make payment. III. In its amended petition petitioner made claim for a deduction for a loss not compensated by insurance or otherwise in the amount of $260,660 which it said resulted from displacements, impairments, and damage, in *413 general to its roadbed. That amount is said to represent the amount of the damage to petitioner's roadbed caused by various kinds of erosion and other natural phenomena. In the alternative, petitioner claims a deduction in the same amount for depreciation and obsolescence. On brief, petitioner now claims a loss deduction in the amount of $229,613.90. Petitioner, by its counsel, says on brief "Should the Court fail to allow the aforesaid loss of $229,613.90, then it ought to allow said sum as a fair and reasonable allowance for depreciation and obsolescence." (a) The impairments to petitioner's roadbed consisted of the existence of water pockets, which, over a long period of time, caused petitioner's track to get out of alignment. Petitioner admits on brief that the condition complained of has been gradual and has developed over a period of years. One of petitioner's witnesses, a geologist, testified that in many places, petitioner's roadbed traversed areas which made poor foundations and which did not provide good material for "fill." When the roadbed was originally constructed, many problems were encountered. The roadbed is constructed over terrain which presents many different *414 types of difficulty. In some places, the land is damp from seepage from natural springs; in other places, plastic clay formations make for bad roadbed conditions. However, these natural conditions have existed for hundreds of years and every roadway over these badlands has experienced the same difficulty that petitioner's roadbed has encountered. The causes for the unfavorable conditions of the land in many areas have existed for several thousands of years. In more recent times, within the twentieth century, there have been floods in the vicinity of petitioner's railroad line. Thus the Mississippi River washed out parts of the line during floods in 1906, 1912, and 1913. However, taking into consideration all of the impediments of nature, it was the opinion of the geologist that petitioner's line "follows as good a route as possible." Petitioner's road has been in service since 1890. In the year 1937, there were no floods or any occurrences in the nature of a casualty. In all the period of the existence of petitioner's roadbed, petitioner has had to strengthen its roadbed, from time to time, against various kinds of erosion, and has had to repair the damage resulting from such erosion. *415 In 1937, it resorted to a new method of stabilizing the roadbed by driving posts. But there was no sudden destruction in 1937 within the connotation of the term "casualty". The condition which petitioner sought to repair in 1937 was not new or unexpected. It was the result of a slow, continuous process which cannot be prevented and which will always exist. The term casualty, as used in section 23(a) (3) of the Revenue Act of 1936 "excludes the progressive deterioration of property through a steadily operating cause." Fay v. Helvering, 120 Fed. (2d) 253. It is concluded that petitioner is not entitled to a loss deduction under section 23(e) (3) in the amount of $229,613.90. The conclusion reached upon the merits of the contention makes it unnecessary to discuss the matter of the amount which petitioner computed to be the measure of its loss, other than to say that there is considerable doubt whether petitioner has established that the above sum constitutes the correct amount of the alleged loss. (b) The alternative contention is that a deduction in the amount of $229,613.90 should be allowed for depreciation or obsolescence of petitioner's roadbed *416 and grading. In answer to petitioner's contention, respondent points out that where a railroad has consistently used the retirement method of accounting in accordance with the regulations of the Interstate Commerce Commission, it cannot claim depreciation on part of its properties, Central Railroad Co. of New Jersey, 35 B.T.A. 501; Chicago & Northwestern Ry. Co., 114 Fed. (2d) 882, certiorari denied, 312 U.S. 692; Cincinnati Union Terminal Co., 44 B.T.A. 905; and that obsolescence upon the capital properties of a railroad is not allowable for the same reason, State Line & Sullivan Railroad Co. v. Phillips, 17 Fed. Supp. 607, affd. 98 Fed. (2d) 651, certiorari denied, 305 U.S. 635. Petitioner has presented no authorities which overcome respondent's argument. Furthermore, the statutory allowance for depreciation and obsolescence, section 23 (1) of the Revenue Act of 1936, contemplates an annual allowance which, year by year, will equal cost or other basis at the end of the useful *417 life of the property in the business. Regulations 94 article 23(1)-1, 2. If, on the basis of some authorities other than those which have been brought to our attention, petitioner is entitled to depreciation allowances on its roadbed and grading, we could not sustain petitioner's claim, because it has failed to establish that the amount in question is the ratable amount reasonably necessary "to recover during the remaining useful life of the property the unrecovered cost or other basis." Article 23 (1) (5). In other words, we should have to disallow this claim for failure of proof. Petitioner's claim for the depreciation deduction is denied. The parties have entered into stipulations which require recomputation of the deficiency. Decision will be entered under Rule 50. Footnotes
*. Note: Should be $60,233.12.↩
1. It is stipulated that petitioner made advances to Coaches, Inc., exclusive of depreciation, to cover operating losses during 1932 to 1936, inclusive, as follows: ↩
1932
$ 6,903.80
1933
8,898.14
1934
5,701.09
1935
5,817.58
1936
5,509.03
$32,829.64